# EXHIBIT F

Declaration of Joanna Whaley

# DECLARATION OF JOANNA WHALEY

I, JOANNA WHALEY, declare as follows pursuant to 28 U.S.C. § 1746:

**1.** I am over eighteen years of age and competent to testify. I make this declaration based on my personal knowledge and, where indicated, on my review of records maintained by my campaign committee and my legislative office. If called as a witness, I could and would testify to the facts stated here.

**2.** I submit this declaration in support of the motion of the Michiganders for Money Out of Politics Ballot Committee, other organizations, and me to intervene as defendants in this action.

**Background and current position**

**3.** I am the State Representative for Michigan's 2nd House District, which includes Allen Park, Lincoln Park, Melvindale and Southgate, MI. I was first elected to this office in 2026 and was most recently elected on NOVEMBER 3RD, 2026, receiving 22,343 votes (62.5%) against 13,414 votes for my nearest opponent. My current term expires on DECEMBER 31ST, 2029.

**4.** The district I represent has approximately 90,000 residents. The district is a suburb of the city of Detroit and is primarily working lower and middle class residents. To my knowledge, the overwhelming majority of households and businesses in my district receive electric service from DTE Electric and gas service from DTE Gas, both of which are regulated by the Michigan Public Service Commission.

**5.** My campaign committee has never accepted contributions from DTE Energy, Consumers Energy, their political action committees, or, to my knowledge, any entity affiliated with them.

**Intent to seek reelection**

**6.** I intend to seek reelection to the SECOND HOUSE DISTRICT in the 2028 election cycle. I am not term-limited from doing so. My candidate committee, COMMITTEE TO ELECT JOANNA WHALEY, remains registered with the Michigan Department of State and has not been dissolved.

**7.** Because I hold elective office and have not declined to seek reelection, I understand that I am a "candidate" under Michigan campaign finance law today, not only after I file. My opponents and any outside groups that wish to influence my race may begin communicating about me at any time, and in my experience they do so well before the formal campaign season.

**Experience with undisclosed independent spending in my races**

**8.** In my 2026 Primary and General elections, outside groups ran communications about me in my district. I recall in particular during the general election my opponent was running advertisements targeting myself and my children in his political ads calling me an "absent father" and claiming I walked out on my children, which is entirely untrue. These advertisements caused harm to my family and reputation damage among voters in the district, and potentially led to an incident of near violence. The ads were completely unfounded and untrue however they were run and funded by unknown funds that were donated by my primary opponent. The ads were continuous and were funded by money that was unable to be traced. The communications ran during the final 5 weeks before the election. Based on my campaign's monitoring, I estimate the total cost at $15,000.

**9.** Those communications did not use words like "vote for," "vote against," "elect," or "defeat." They were based on my family dynamics and made voters believe that my parenting and family situation would translate into my legislative work. My democratic primary opponent accepted regulated corporate money and donated it to my general election opponent. My primary

opponent was taking money from corporations and donating those funds to my general election opponent who then ran ads of this nature.

**Experience with utility political spending**

**10.** I have personally been contacted by representatives of DTE/Consumers during the 2026 election cycle. On two occasions in the last two months of the general election cycle, the same individuals or their colleagues were present at a fundraiser and caucus event at which contributions to legislators were solicited. I describe this not to allege that any legislator traded a vote for a contribution, but because it reflects my experience of how closely the utilities' lobbying and their political giving are connected in Lansing.

**11.** Constituents in my district regularly raise with me the cost and reliability of their electric and gas service. In Allen Park, Lincoln Park, Melvindale and Southgate, MI, constituents have told me they believe the utilities have outsized influence in Lansing because of their political spending, and some have told me they assume legislators, including me, are beholden to the utilities for that reason.

**12.** I publicly supported Proposal 2. I endorsed the measure on May 7th, 2026 because and to clearly communicate to my constituents that I wholeheartedly work for them and not for corporate interests. Voters are asking for their legislators to listen to them instead of lobbyists, my endorsement spoke to this commitment.

**Harm to me if the electioneering-communication and expenditure provisions are invalidated**

**13.** I understand that Proposal 2 requires any person who spends more than $5,000 in a calendar year on communications that refer to a clearly identifiable candidate, within 100 days of a general election or 30 days of a primary, and that are targeted to that candidate's electorate, to

file a report identifying the communications, the vendors paid, and the donors who gave more than $100 for that purpose. I also understand that Proposal 2 treats a public communication that promotes, supports, attacks, or opposes a candidate as a reportable expenditure even if it avoids words like "vote for" or "vote against."

**14.** If those provisions are invalidated, the communications I describe in paragraphs 11–15 will again be exempt from any disclosure in my 2028 race. Based on my experience, I expect that outside groups will again run communications about me that avoid express advocacy and that I will again be unable to learn who is paying for them.

**15.** That will harm me as a candidate in concrete ways. First, I will be unable to respond to the message by identifying its source, which in my experience is the most effective response available to a candidate facing an anonymous attack. Second, I will have to divert campaign funds and staff time from my own message to rebutting communications whose sponsors I cannot name; in 2028 that cost my campaign approximately $100,000 and 100 staff-days. Third, I will have to make decisions about fundraising, advertising, and field operations without knowing how much outside money is being spent against me or by whom, which puts me at a disadvantage relative to a sponsor who knows exactly what it is spending and who is funding it.

**16.** Under current law, an outside group can run a communication supporting me that I did not request and do not want, and I have no way to learn who funded it. Voters may then attribute that group's agenda to me. If Proposal 2's reporting requirements take effect, I will be able to learn who funded such a communication and, if appropriate, disavow it.

**Harm to me if the utility contribution ban (§ 30a) is invalidated**

**17.** I understand that § 30a prohibits electric and gas utilities regulated by the Michigan Public Service Commission, their principals, and entities affiliated with them from contributing,

directly or indirectly, to candidates for Governor, Attorney General, state Senate, and state House, to committees that contribute to those candidates, and to certain entities affiliated with those candidates. I understand that, unlike § 30b, § 30a has no delayed-enforcement period and will apply to my 2028 race from the day Proposal 2 takes effect.

**18.** If § 30a is enjoined or invalidated, I will face a choice I do not now face. I can accept contributions from the utilities and their affiliates, or I can decline them and run against an opponent who accepts them. I have declined them in the past and intend to continue declining them. Section 30a removes that disadvantage by applying the same rule to every candidate for my office. Without it, my decision to decline utility money becomes a unilateral disarmament that my opponent need not match.

**19.** Section 30a also affects how I do my job. Many of my votes will directly affect the utilities' revenues. When I cast those votes, I want my constituents to judge them on the merits. I do not want to be accused of being influenced by utility money even though I have not accepted it. Section 30a allows me to tell my constituents, truthfully and verifiably, that no candidate for my office may take utility money and that my votes on utility matters cannot be attributed to such contributions. If § 30a is invalidated, I lose that ability.

**20.** Section 30a's reach to candidate-affiliated entities also matters to me. I understand that it bars utility contributions to an entity that I established, finance, or control, or for which I have solicited funds in the past two years, if that entity spends more than $500 in a cycle on my race or pays my expenses. In my experience, contributions routed through such entities—leadership PACs, caucus committees, and issue organizations associated with a legislator—are a principal way that interested donors support legislators without a reportable direct contribution. I have not accepted utility contributions through it. Without § 30a, I expect

that channel to remain open for my opponents and for utility-funded organizations seeking to influence legislators generally.

**Harm to my constituents**

**21.** The overwhelming majority of my constituents are captive ratepayers of DTE. They cannot choose a different electric or gas provider. The rates they pay are set by the Michigan Public Service Commission under laws the Legislature writes.

**22.** If the electioneering-communication and expenditure provisions are invalidated, my constituents will again receive communications about me and my opponents without any means of learning who paid for them. In my experience, voters evaluate a message differently when they know its source.

**23.** If § 30a is invalidated, my constituents will continue to be in the position of paying regulated rates to a company that uses revenue derived from those rates, or from its shareholders and executives, to fund the campaigns of the legislators who set the rules for that company.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 11/09/2026 at Lincoln Park, Michigan.

________________________________

Joanna Whaley - State Representative Elect - HD2

11/09/26